The next case today is American Food Systems, Inc. v. Firemans Fund Insurance Company, et al. Appeal No. 21-1307. Attorney Kanner, please introduce yourself for the record and proceed with your argument. May it please the Court. Alan Kanner for the Appellate American Food Services, or AFS. We were the plaintiff below. Your Honor, if I may, I would request three minutes for rebuttal time. Yes, you may have it. Thank you, Your Honor. Before I get into my comments, I did want to jump back, if I could, to the risk questions that were raised by Judge Barron and by Judge Thompson. We have alleged in our complaint both the presence, the risk, and the government orders, alternatively or collectively. We've also alleged suing labor as a requirement. Risk is certainly covered under the policy. The covered cause of loss language is a definition called risks of direct physical loss. And in interpreting the contract in Massachusetts, we're reminded to look at specifically at what reasonable expectation of a party would be who buys a policy that talks about risks of direct physical loss. A classic situation would be a super storm is coming not towards New Jersey or New York, but coming towards Massachusetts, and an evacuation is ordered. And whether or not it actually hits, we believe that that's a situation where it would be recovered. Do you have a case that tells us that about the risk? Because one might read risks as just the label for the different types of things that are then covered, like direct physical loss, rather than the coverage being for the risk of the direct physical loss. Off the top of my head, I have four cases for your honor. First, and I believe we cite this, or it was certainly cited in Matzner, Hughes versus Potomac. That's an 18 Cal reporter, 650 at page 655. I could be fine, but there's a 28J letter just to save us time. Okay, so it's Hughes, Murray and Port Authority, and I'll send you that. I did want to mention that the Gilbane case from the Mass Supreme Judicial Court, that was the case with the glass falling out of one building. And they held that the guy next door could recover for loss of access, even though there was no tangible property damage in the sense of a structural damage. I also want to note that Hughes goes back to 1962. The industry is aware that this language has been, I mean, they could have made better language as a practical matter, but they've chosen not to. I think the Gilbane court is not directly on point, but it is very relevant to the risk analysis. I think that Judge Thompson's question about the duration of the virus, I think that's a very good question. And we talk about this in some detail in our complaint. We talk about the fact that there was a presence. I would just note for the record that attached to our complaint was also the denial letter and the insurance policy, and they're both part of the joint appendix. In the denial letter, one, they admit that we have alleged that it was present, but they say that's not good enough. And they relate the story of the delivery man with COVID who went to all seven locations that had to then be closed and cleaned. But more importantly, we say that the only way to really decontaminate a building is to depopulate it. The trial judge came up with this idea that you can just get some handy wipes and COVID is gone. If that was true, the federal courthouse would be open. The problem is you don't look at this in a static fashion of a one day cleanup. Buildings like restaurants and courthouses are dynamic. So it's the continued, even though COVID itself may die after a certain period of time, we say it's an extended period of time. The trial court, of course, decided it was very transient in a short period of time, which was not within his purview. So what would happen is you decontaminate by removing people, which is what essentially if I understand what the amicus was just arguing to us, which is as a common sense, practical matter, she's not taking issue with anything you're saying. If I understand it, she's saying the policy language is such that there needs to be some damage to the structure itself in order for the policy to cover it. And since you're not showing that there's any damage to the structure, it doesn't matter. She then says it follows from that that carbon monoxide leak would not itself be covered. Odors might not be covered unless they so emanate from the structure itself. But that's her argument about the right way to understand the text of the policy. What's wrong with that? It's wrong in Massachusetts, and it's wrong in the majority of states around the country. What Matzner and Essex say, and Arbiter, but more clearly in Matzner and Essex, certainly, is that that language is ambiguous in this context where you have a physical alteration of the property, i.e. the presence of the carbon monoxide. We say the presence of the virus. When you're saying the property, this is just to pick up on Judge Thompson's point about interior versus structure. Are you saying the presence of the virus because of its adherence to the structure or because of its presence in the air and the interior? Does that matter? We've alleged both. I'm not sure. We've said that the foam might sort of permeate the building and they're there. I don't think that either Essex or Matzner thought that that was a distinction that mattered in terms of whether physical loss or damage had occurred. But what they're saying is it's ambiguous. And what Matzner says is if there's an ambiguity, you construe it against the insurer who wrote the policy and in favor of the insured. And so, we are alleging clearly that there was a physical alteration, the presence of, and we can talk about what we mean by presence, but the presence of the virus. Certainly, the courts have said that when that happens, whether it's a dangerous or odious substance, is in the building and renders it uninhabitable. If you have a business income policy, you can recover for that. What the defendants are saying and what the amici just said to you basically is if you not make a claim for covered property damage under the policy, you don't get to go to your business income policy. There is no language in the policy whatsoever that would support that kind of analysis. The policy doesn't say that at all. You can't recover under the business income part unless you can show direct physical loss or damage. Yes. So, what she's saying is you can't meet direct physical loss or damage unless you can show something happened to the structure. I should have been a little clearer. We feel the language direct physical loss does cover the physical alteration that occurs when there's a dangerous substance introduced in the building. Now, if you were to then say, I want to make a property damage claim because there's carbon monoxide in my building, there'd be no there there, right? And so, but you would say the carbon monoxide satisfies the direct physical loss or damage. As that language is used in the business income policy, yes, that's what I'm saying unequivocally. Let me see if I understand a separate strand of your argument picking up on Judge Thompson's questions about duration. As to buildings which regularly have people come into them, there is a, you say, physical damage. As long as you are open to whatever public you're open to, it is physical damage in that sense out of the sheer duration of it. Correct, Your Honor. And then when you shut down a building, and there are two reasons to shut down a building. Four minutes remaining. Four minutes. You know, when you shut down the building, it will eventually decontaminate, as we've alleged. Then it remains closed because of the risk. If it reopens inappropriately, then you've got the physical presence again and the danger to people. Now, I want to just emphasize one thing that people haven't talked about and defendants haven't talked about. All of these policies, including our policy, AFS's policy, require compliance with government orders, but also require reasonable actions to protect property in the face of actual or imminent risk of harm. If you look at Joint Appendix 124, and I can give you the citations if you want in that letter, duties in the event of loss or damage take all reasonable steps to protect the property from further damage. At Joint Appendix 134, definition of extra expense includes the cost to avoid or minimize the suspension. But for purposes of this appeal, the only thing that is before us is the fight over the meaning of the phrase risk of physical loss or damage, correct? No, maybe I'm misunderstanding you, Your Honor. I think the question is, the only issue before us is, is this a plausible claim that should be passed, the motion to dismiss? And the fact that the First Circuit and— Let me put it this way. If we were to conclude that the allegations do not show a risk of physical loss or damage, can you get past 12B6? Yes, we do. Looking at the fact that we had to shut down a number of our—all seven of our covered locations because somebody with COVID showed up and we had to clean it up and lost a day of business, that certainly would get us passed. But I— Wait, even if you didn't satisfy the—even if we conclude your allegations did not show direct physical loss or damage, risk is direct physical loss or damage? Because the physical— Because we're not—I mean, assume we accept that the substance has to permeate the structure. I mean, if that is true, then where are you? Well, we have expressly alleged that it permeated the structure. I think that's paragraph 40 of our complaint. But I'm concerned that I'm misunderstanding Judge Barron's point. If whatever—let's say we totally understood every word you've said today, and we issue the following ruling. What has been alleged does not suffice to show a risk of physical loss or damage. Could you nonetheless win under 12B6? I mean, I want to read the opinion, but if you're saying you reject the idea that physical alteration as opposed to structural damage does not work in Massachusetts, I would— You lose. That's fine. I would lose, yeah. That just shows that the issue before our court solely focuses on the words risk of physical loss or damage. That's what we're construing. You have to have us construe it in your favor for you to have an actual claim against the defendant. If we don't, you cannot go forward. Yes, but one disagreement, Your Honor. We've alleged a number of theories in the alternative. We've alleged the presence as a reason. We've alleged the risk, and we've alleged government order, and we've alleged sue and labor or some combination. You have many— That's time. —to supporting that claim. Did you want me to just address the Mass Supreme Judicial Court issue? Yeah, I was going to ask you about the similarities or not. I would think, and I'm just assuming for the sake of argument that the Mass Supreme Judicial Court relatively just focuses on the issues in front of it and doesn't give a broad advisory type opinion, which I think is a fair assumption. In Viverine, the allegation in all of the cases is the government order, and I don't think they're going to get into sort of the Massner-Essex to resolve that issue. I think it should be resolved. I understand that in the legal seafood case, there was a request that that case also be certified, and I don't know whether the— I know Judge Barron's been on that panel. I don't know whether that is actually going to happen or not, but we are different from Viverine in a lot of ways. They don't get to issues of contamination or what kind of contaminant. Is it transient? How does it permeate a building, for example? Excuse me. Will the SJC necessarily have to address the definition of direct physical loss of or damage to insured property? They will in the sense of, can a government order without more be sufficient to plead direct physical loss? As you know, we're pleading essentially something very different from that, and so I think it is highly unlikely, just trying to be objective, that they would get too far into that without having some facts in front of them to maybe guide their analysis, Your Honor. With respect to legal seafood, we're very similar, but we have a definition of property damage in our complaint that talks about loss of use and lack of tangible damage, and I feel like that's important. The courts in Chinese Drywall, the courts in Travico, citing the First Circuit's decision in Essex, thought it was important to look at that under the doctrine of reading the policy as a whole and the reasonable expectations of the policyholder in terms of what might be covered. So if they're defining property damage like that, isn't it reasonable for a consumer, objectively reasonable, to believe that loss of use would be covered in the event that some sort of contaminant or government order was issued? There are some other differences. I think we are much more robust in our allegations of the presence of  I'm not saying they should lose or whatever. I note that in the Kingsbury decision, the court was very clear in saying that both the government order and virus was the cause. What's really interesting in these cases is the insurance industry, when somebody has a virus exclusion, they say it's the virus. And in a case like this, they say, well, the government order. If somebody says there's a virus, then they shift gears and say it's the government order. One thing I liked about the Kingsbury decision was the court there, California court applying New York law, said I think they're both causal in this situation. And I think at this stage of the proceedings, that's a fair assessment of where we are. Mr. Kanner, I have a question. Earlier, you started getting into the mitigation of loss language of the policy. At the time, I thought you were going far afield. And indeed, we brought you back to the basic coverage language. But it has occurred to me that you are saying, as we look at the definition of the basic property loss, physical damage, that we, in interpreting those, can fruitfully look at the mitigation language under the you look at the whole policy rubric. Now, are you making that argument? That's exact. There was a method to my madness. And that's exactly the point I was trying to make. And I think any fair reading of those requirements at 124, page 134, 174, and 120, all show that what the insurance company is saying is you're not going to ever get paid if you don't do certain kinds of things in anticipation of a loss or in response to a loss. And I think that's very significant in understanding what this policy is. Got it. Thank you. Thank you. Thank you for the question. I've reserved. Thank you. I guess that's all. We'll hear you on rebuttal. Thank you, Your Honor. At this time, Mr. Kanner, please mute your audio and video. And Attorney Solberg, if you could please unmute and introduce yourself on the record to begin. Thank you, Your Honors. And may it please the court. My name is Brett Solberg. I represent the FLEs, in this case, Fireman's Fund Insurance Company, Nylion's Global Risks U.S. Insurance Company. I'd like to start, if I could. There's a bunch of questions, and I'm just going to try to answer them all, as many as I've written down. Um, Judge Lynch, your question about mitigation of loss. The Sue and Labor Clause in these property policies and property policy issue here, that only applies if the loss itself would indeed be direct physical loss or damage, i.e. a covered loss. In this case, COVID-19 is not a covered loss, just like the snow removal was not a covered loss in the Roche Brothers Supermarket case. I think you've missed the point. The point he's trying to make is, as you try to determine the definition of physical loss, you ought to look at the entire policy, including those. So, thank you for the response. What's your next point? Well, and that's a fair point, Your Honor. And to that point, you also have to then look at the period of restoration language, which the Sixth Circuit has said that baked into the timing provision in the period of restoration is the imperative that damaged property or lost property be rebuilt, replaced, or repaired. And so, the question came up earlier in the SAS argument of whether or not the mere presence of COVID on the property was a gatekeeping question. Well, it is not a gatekeeping question, and you have to look at the period of restoration because, well, you don't have to look directly at the duration of the period of restoration, but you do have to actually have allegations that the property that they're alleging was lost or damaged actually was repaired, rebuilt, or replaced, otherwise, almost by definition and certainly by implication. But that was not the basis of the ruling below, was it? The court below did not address the period of restoration, you're correct, Your Honor. So, the reason why it is a gating question is that although you could also lose if you didn't have repair and restoration allegations that were sufficient, even if you did seemingly have them, you automatically lose if you don't have direct physical loss allegation. I understand your point, Your Honor. What I would say in response to that is to have… Are you trying to make the suggestion that the word repair counts against the notion that cleaning to remove a virus could plausibly be understood to be repair and that that suggests that adherence to the structure is the kind of risk of loss they're talking about? That's precisely right, Your Honor. You cannot have a direct physical loss or direct physical damage without… Well, fire causes smoke damage, and that's cleaning to the building. I'm sorry, Your Honor, you cut out mid… I said fire causes smoke damage, and that's cleaning to the building. Is that not covered? Smoke damage wouldn't be covered? It depends if it's ancillary to a covered loss. In the case of a fire in a building, cleaning the smoke damage certainly would be a covered loss. Is that because the word repair covers cleaning? No, not because the word repair covers cleaning, but because there was a repair that was necessary due to the fire in the first place. Why do you get coverage for the cleaning? Because it's ancillary to the direct physical loss or damage caused by the fire. What they're trying to do in this case, Your Honor, is say that the thing… So, let's take the carbon monoxide case as an example, specifically the Maxner case that we just talked about. I just want to… Before you get to that, I just want to… I thought your argument was that the word repair suggests that direct physical loss has to be structural. It does. It has to be damaged in structure or personal property. Yes, Your Honor. The word repair can encompass cleaning. No, Your Honor. The cleaning would be ancillary. What does that mean, ancillary? Is there some clause that says ancillary things are covered? Yeah. Your Honor, all necessary restoration… And repair. …results… Repair, yes, Your Honor. The results… The restoration and repair encompass cleaning. Not cleaning by itself. No, I'm just saying the cleaning costs fall within restoration and repair. In the example of smoke damage from a fire… So, the words restoration and repair do not themselves suggest that the loss must be structural. That's all I'm saying. No, Your Honor, because there has to be… The word loss or damage may imply it has to be structural, but the word repair doesn't, because you just acknowledged repair and restoration encompass mere cleaning, which is what they're saying that you would have to do to deal with the adherence of the virus. If the repair was… First of all, the words aren't repair and restoration. Repair, rebuilding, or replacement, just to be specific. Those issues, those repair, rebuilding, replacement, that requirement dovetails with the requirement that a loss or damage be physical. Those two things taken together necessarily require either structural alteration or, in the case of a loss, in some states have held that a loss can be permanent uninhabitability of a structure, which Massachusetts has not necessarily adopted, but it's something that's at least tangentially argued it's not present here because there's no allegation of uninhabitability. So, it's direct physical loss or damage to insured property. If it's only direct physical loss… Our language is a little bit different, Your Honor. Okay. Our language is direct physical loss or damage to property, so we don't have the preposition of. I don't necessarily think it makes a big difference, but I just wanted to point that out. But you're differentiating between loss and damage. So, you can think of it as a specter. The majority of states in the country, including Massachusetts in the HRG case, said you can't have direct physical loss without direct physical damage to property. And they think of loss and damage as a spectrum. So, on the one hand, you have damage, which is that, for example, a house catches fire and the garage burns, but the whole house doesn't burn. You've got damage to the house, but you don't have a total loss. If the whole house burns down, it's a total loss. So, it's perfectly reasonable to read direct physical loss and damage to require structural alteration across the board for both things. Some states, starting with New Jersey and a few other states, but it's still very much a minority position. Why wouldn't a virus adhering to a wall be structural damage? How does it change? Because in this case, Twombly-Iqbal requires that they explain that a plaintiff saying that a virus, which is a coronavirus, is the same thing as a common cold. It's just more dangerous to human beings than a common cold. It's a lipid and a protein in a lipid shell. That's all a virus is. They're ubiquitous. That's the allegation. Cold's ubiquitous. Flu's ubiquitous. Common experience and common sense, which are the hallmarks and the touchstones of Twombly-Iqbal analysis, say that adhering to a surface, a virus adhering to a surface doesn't do anything to the surface that causes a harmful physical or structural alteration to the property that requires repair, rebuilding, or replacement. That's not incumbent on us to plead. That's incumbent on them. It requires cleaning. It requires cleaning of some sort or not. I mean, they've pleaded and Mr. Kanner just said, all you got to do is wait. And the virus, the risk that the virus poses to humans goes away. It's important to note that the virus at no point ever poses risk to property. They've never alleged that. What they allege is that the virus being present— How does soot pose a risk to property? Soot can discolor property. It can make it smell bad. It can change it in a way that detrimentally affects the physical structure of the property. Okay. So you're saying you have to make a showing that it somehow renders harm to the physical structures itself. And in fact— You can see that there are states that don't accept that view of loss or damage. So to your first question, your honor, that is what the policy language specifically says. It says direct physical loss or damage to property. There are some states that don't construe that language that strictly. Yes. And in those states, what they say, and the classic example is the Port Authority of New York, what those courts say is that you can have a loss of property if the property, if its functionality is completely destroyed or it's rendered in the case of a structure completely— Five minutes remaining. Five minutes. And that makes sense because that's akin to a house burning down. The Port of New York and New Jersey case was about asbestos. And they said if you get enough asbestos in the air, you can never use the property again. Now, they didn't hold that, but they speculated on that. So, yes, those— And does that—and that theory can't be time limited? In other words, if it would be uninhabitable, say, for the life of a year or so, is that recoverable or not? No, your honor, that would be a loss of use, a temporary loss of use. And there are lots of cases that discuss why, and they say them much better than I do, and we cited them in the brief, about why a loss of use in this context can't be a physical loss. And more or less, it boils down to common sense. The example used is there's a difference between losing your car in an accident, having it totally destroyed, and losing the use of your car for a month or five days or whatever while it's being repaired. And it's important to note that the business income coverage we're talking about here is a loss of use coverage. It covers the business income that would be derived from the property if that property is physically lost or damaged. Counsel, I'd like to go back to your repair, rebuild, or replacement. I understand certain surfaces tend to hold virus much longer than others. I understand certain exhaust systems simply are inadequate. Suppose in a restaurant, a food place, a hospital has to replace a bunch of surfaces to come up with surfaces that are much less likely to have fomates attached to them. Suppose further that they have to replace their HVAC systems. Under your definition, is that the type of damage to property that could be covered at least if it is pled at the 12B6 stage? No, Your Honor. The reason why is because the repair, replacement, or rebuilding has to be in response to a physical loss. So that is a structural alteration or destruction of property. We're getting a bit circular now, and that's where I started. Yeah, and I acknowledge that point, Your Honor, and other courts have done so too. You use the other policy terms to help inform what the key policy language that we're talking about here means. And in doing so, it's not a perfect dance. It sometimes gets a bit circular. But the key to focus on, if you accept the definition or if you accept the interpretation of this policy that my opponent is arguing should be accepted here, you have read the word physical. You need to read the word physical out of the definition. There's no other way to do it. Loss of use can't be a physical loss, and the presence of the virus on the property, they've not pleaded how that causes a harmful, demonstrable, tangible physical alteration to the structure of property. They simply haven't done it. And it's incumbent on them, and the Third Circuit even said that in the Ports of New York and New Jersey case. It said that physical damage to a building as an entity from sources unnoticeable to the naked eye demand more. And that was even pre-Twombly, pre-Iqbal. And so we would submit that they would have to explain to you how COVID-19 causes loss of damage. And it's important to note here what the coverages they're seeking are all ancillary coverages or secondary coverages. What we would expect to see and what we see in every single first-party property insurance coverage claim is, I've had this damage, and I have paid X dollars to repair it, and then I've also had to shut my business down. What we have here instead is, I've had to shut my business down because the government ordered me to do it. That's really the root of their damage or their harm here. And as soon as the government said, you can open up again, they opened up again. What changed? What was repaired? What was replaced? Nothing. They've not pleaded that anything changed at all other than the government told them they could do that. I also want to talk real quick. It's time. Finish your sentence. Make it very quick. Thank you, Your Honor. The Sixth Circuit and viral expressions, which we alerted the court to in a subsequent letter, rejected almost precisely the same sort of allegations of the presence of COVID-19 on the property that AFS makes here. It rejected them as conclusory and unhelpful and not meeting the rules of 12. Yes, what is your question? Would you like me to address the Verveen Legal Seafoods issue? Uh, yes, you get a minute to do that. Thank you, Your Honor. These cases are materially the same. They have materially similar language. I was, while other counsel was speaking, I was looking at the Verveen briefing. The plaintiff in Verveen claims that they pleaded that COVID-19 was on the premises, claims that they pleaded that sufficiently and that that should be an issue in front of the SJC. So, yes, these questions are squarely before the SJC, Your Honors. Okay, thank you. Thank you, Your Honor. Attorney Kanner, if you could unmute your audio and video at this time and reintroduce yourself to begin, you have a three-minute rebuttal. Yeah, Alan Kanner for American Food Services. I just want to point out to the court some of the breadth of direct physical loss or damage, which I think was part of the Matsner and Essex decisions. If you look at the trial court in this case, what did the trial court see when he read these words? He saw things like enduring impact to actual integrity of the property. He saw transient phenomena. He saw imperceptible. He saw permanently uninhabitable or unusable. He rewrote the contract to suit his perception rather than saying, what would a non-lawyer or non-judge understand here? Defendant just said, we've never talked about physical. Yes, we have. Look, the virus is material. The judge's own definition of this was that it was material phenomena, but it was a transient phenomena. So, therefore, it may be material, but it's not covered. A nuance that nobody could see in this language. Could you address the distinction that was just made between loss of use and physical loss that he's drawing? This is not a classic loss of use case, like a Murray where the house was going to fall down or the case by the ocean, because here we are alleging physical alteration of the property by virtue of the presence of the contaminant. We have made allegations, not only that it. I understand you're saying alteration, but how is there damage or loss to the property? How is the property harmed by the presence of the virus on it, other than by the loss of use that results? Because it goes from being just a restaurant to a super spreader. If you don't do something about it, it transforms the building. It transforms how the building performs and operates. Prior to COVID, the building operated just fine buildings in this case, but it literally turns these buildings into super spreaders. And that's why there are restrictions on bars. There are restrictions on restaurants. And those are, I think, stem from that transformation. We specifically allege that in our property, in our pleadings. And I believe that's as physical as it can get. And remember, you have to take the policy as a whole. He said, you only get money if it's a covered loss. To some extent, he's begging the question because he's saying you don't cover this. And he does the same thing under civil authority. But remember, if you look at the entirety of this policy, there's also a CGL part of this policy. If people are getting harmed, suffering bodily injury by virtue of using this restaurant, they're on the hook. But they would say, oh, no, we're not. Because you didn't take precautionary action. That's time. Okay. Thank you very much. Thank you, your honors. That concludes arguments for today. This session of the Honorable United States Court of Appeals is now recessed until the next session of the court. God save the United States of America and this honorable court. Counsel, you may disconnect from the meeting.